**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **HOLLIS BOUTAIN, ET AL.** | **CIVIL ACTION NO.  11-1907** |
| **VERSUS** | **JUDGE SARAH S. VANCE** |
| **RADIATOR SPECIALTY COMPANY, ET AL.** | **MAGISTRATE JUDGE DANIEL E. KNOWLES** |

## <u>DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF DEFENDANTS' INDUSTRIAL HYGIENIST, JOHN SPENCER</u>

NOW COME, defendants Chevron U.S.A., Inc., Oil Insurance Limited, and Insco, LTD., and submit their Opposition to Plaintiffs' Motion to Exclude Testimony of Defendants' Industrial Hygienist, John Spencer (Rec. Doc. 109). Mr. Spencer is qualified to testify in the field of industrial hygiene and employs reliable methodology that will help the jury understand the facts and issues in this case. The alleged problems with Mr. Spencer's methodology described by Plaintiffs' counsel are merely appropriate subjects for Plaintiffs' cross-examination and do not serve as a proper basis to exclude the proposed expert testimony of Mr. Spencer.  As such,  Mr. Spencer's opinions satisfy the criteria of Federal Rule of Evidence 702 and *Daubert*. Accordingly, Plaintiffs' attempt to exclude Mr. Spencer is meritless, and their motion to exclude Mr. Spencer should be denied.

## LAW AND ARGUMENT

This Court has previously addressed the *Daubert* standard in *Imperial v. Travelers Property Casualty Co.* at length.[1] Federal Rule of Evidence 702 gives the district court considerable discretion to admit or exclude expert testimony.[2] Rule 702 provides that an expert witness "qualified by knowledge, skill, experience, training, or education," may testify when scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.[3]  For the testimony to be admissible, Rule 702 requires that (1) the testimony be based on sufficient facts or data, (2) the testimony be the product of reliable principles and methods, and (3) the witness apply the principles and methods reliably to the facts of the case.[4]

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."[5]  The Court's gatekeeping function thus involves a two-party inquiry into reliability and relevance.  The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence.[6] First, the reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the experts' testimony is valid.[7]  The aim is to exclude expert testimony based merely on

---

[1] 654 F.Supp.2d 518 (E.D. La. 2009).
[2] *See General Electric Co. v. Joiner*, 522 U.S. 136, 151 n.1 (1997).
[3] Fed.  R. Evid. 702.
[4] *Id.*
[5] 509 U.S. 579, 589 (1993).  *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony).
[6] *See Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).
[7] *See Daubert*, 509 U.S. at 593.

PD.8396256.1

subjective belief or unsupported speculation.[8]   Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence, in other words, whether it is relevant.[9]

In their memorandum, Plaintiffs set forth primarily five (5) arguments in support of their motion to exclude Mr. Spencer, each of which will be addressed individually below.  As will be shown, Mr. Spencer's methodology is in all respects scientifically valid and reliable and fully meets the criteria of Federal Rule of Evidence 702.

A.    **Spencer's Methodology Uses Complete and Accurate Facts as the Basis for His Opinions**

First, Plaintiffs claim that Mr. Spencer's opinion is based on "incorrect or incomplete facts" regarding the alleged benzene exposure experienced by Plaintiff while employed at the Alliance Refinery from 1971 to 1976.  However, in their memorandum, Plaintiffs fail to point out any particular instances of inaccurate or incomplete facts.  In forming his opinion, Mr. Spencer utilized and relied on all air monitoring results available and the facts relied on by him are both accurate and complete.  The only issue addressed by Plaintiffs in this section of their memorandum is Mr. Spencer's ultimate opinion that Plaintiff's cumulative benzene exposure was less than 8.05 ppm year, versus Plaintiffs' expert's opinion of 30.8 ppm year.  In support of their argument regarding the purported inaccurate facts relied upon by Mr. Spencer,  Plaintiffs rely only on the opinion of their own expert in industrial hygiene, Mr. Nicas, and do not cite or describe any particular factual inaccuracy or incomplete facts upon which Mr. Spencer

---

[8] *See id.* at 590.
[9] *See id.* at 591.

PD.8396256.1

purportedly relies in forming his opinions.  As such, this argument does not support Plaintiffs'
motion *in limine*.

### B.    Mr. Spencer Uses Reliable and Scientific Methodology

Next, Plaintiffs criticize Mr. Spencer's methodology by claiming that he "ignores actual
air monitoring results for pure benzene" and "improperly dilutes the measured results by
applying his flawed calculation for an 8 hr. TWA of exposure."[10]  However, once again,
Plaintiffs' counsel does not put forth any evidence that Spencer's methodology is flawed and
instead relies on conclusory allegations about Spencer's opinion.

Contrary to Plaintiffs' statements, Mr. Spencer does not ignore any air monitoring results
for benzene – all results are utilized, nor does he improper dilute the results.  What Spencer does
is to determine the comprehensive exposure assessment of Mr. Boutian, and the methodology
employed by Mr. Spencer is both scientific and well-accepted by other industrial hygienists. In
defining his methodology, Mr. Spencer relies on six (6) basic tools to conduct personal exposure
assessment:

1.    a characterization of the environment in which the exposure occurred
(including room size and ventilation rate);

2.    a characterization of the job and tasks conducted in that environment
(including frequency and duration of exposures);

3.    a characterization of the products (including volatility);

4.    a review and analysis of historical exposure data collected during tasks
involving the appropriate handling of the product;

---

[10] *See* Plaintiff's' Memorandum in Support of Motion to Exclude Testimony of Defendants' Industrial
Hygienist, John Spencer, II.B. (Rec. Doc. 109-2).

PD.8396256.1

5.    evaluation of exposure data to determine whether accepted air sampling and analytical techniques and/or modeling were used to assess the magnitude of exposures; and

6.    a characterization of the relevant safety and health regulations and the associated exposure limits.[11]

Even a cursory review of his report clearly shows that all of the above considerations were utilized by Spencer.  In addition, proper analysis of the available exposure data would be to utilize the longer term sampling data, that is, data that encompasses 70–80% of the worker's work shift, as opposed to using "grab samples" or small increments of a work shift to calculate TWA that would not be truly representative or accurate as to actual exposure, which is what Plaintiffs' expert did. In explaining this methodology, there are numerous peer-reviewed publications which support Spencer's methodology.[12]  In these publications, it is well accepted that long term samples are the preferred method, and grab sample measurement is the least desirable way, of estimating an 8 \-hour TWA exposure.[13]

Contrary to the methodology employed by Plaintiffs' expert Nicas, Spencer used all data available in determining the comprehensive exposure of Boutain, while Nicas relied on limited benzene air sampling data and some air sampling data that had little or no description of work tasks.  Moreover, unlike Spencer, Nicas failed to time-weight the available air sampling data.  In marked contrast to the comprehensive exposure assessment performed by Mr. Spencer using long term data, Plaintiffs' expert concentrated primarily on two samples.  According to Table 3 of Nicas's report, approximately 86% of the 30.8 ppm-year cumulative benzene exposure he

---

[11] See Expert Report of John Spencer attached hereto as Exhibit A, p. 9.
[12] See John Mulahusen, PhD, CIH, et al. Further Information Gathering; AIHA Guideline on Occupational Exposure Reconstruction; and Nelson A Leidel, et al., Occupational Exposure Sampling Strategy Manual  attached hereto in globo as Exhibit B.
[13] Id.

PD.8396256.1

calculated for Mr. Boutian occurred while he worked in Unit 1792 between January 1972 and June 1973. Moreover, examining Nicas's report, 72% of Mr. Boutian's cumulative benzene exposure from 1972 was based on two short term air samples collected in January 1973. There was no description of the work tasks that were performed during the collection of these air samples and, as such, there was no way to determine whether Mr. Boutian conducted the same activity under the same conditions. Nicas also chose to include these air sample results when calculating Mr. Boutian's cumulative benzene exposure for 1973. Reliable estimates of cumulative exposure cannot be based on two nondescript air samples.

In addition to his reliance on a limited number of samples, Nicas failed to time-weight the data. Again pointing to the two air samples Nicas used for assessing benzene exposure in unit 1792 in 1972, those two samples were partial shift samples – one having been collected over a period of 90 minutes and the other collected over a period of 180 minutes. There is no information to indicate that those concentrations were experienced over the entire 480 minute typical shift length. Considering the other data collected in 1973 from unit 1792, ranging from <0.09 ppm to 5.25 ppm as an 8-hour time weighted average, the January 1973 data were skewed high, which is erroneous methodology employed by Nicas.  Time-weighting the data, as was done by Spencer, would be the more scientifically reliable methodology.

Also, according to Nicas. he used two short term benzene samples of 8 ppm and 52 ppm in order to provide the estimate of Mr. Boutian's 30 ppm exposure when draining lines during the 1.5 day period during shutdowns that occurred in 1973 and 1976. The 8 ppm sample was collected over a 42 minute time period when the operator was draining the reflux drum boot and performing benzene analysis and the 52 ppm sample was collected during a 22 minute period of

time when blowing down drains, collecting samples and measuring specific gravity. However, without more information, it is not scientifically possible to associate the data from these two tasks with the activity of draining lines during a shutdown in unit 1792 in 1973 and in unit 1791 in 1976 with Mr. Boutian, and this is an additional error by Nicas.

On the other hand, Spencer's methodology does not make the errors noted above by Plaintiffs' experts.  In order to provide a better estimate of Mr. Boutian's cumulative exposure, Spencer used <u>all</u> of the data available, including the assumptions used by Nicas regarding exposure duration, time weighted the available data, used all the 1973 data to represent exposures between 1972 and 1974, and used the 1976 air monitoring data to represent exposures between 1975 and the end of 1976, which is the proper methodology to determine overall cumulative exposure of a worker.[14]

### C.     Spencer's Exposure Calculation is Based on Reliable and Accurate Methodology and Data

Third, Plaintiffs take issue with Mr. Spencer's calculation of Plaintiff's benzene exposure.  In particular, Plaintiffs point out a number of specific issues with Spencer's calculations that can be grouped into two general categories: selection of data points and calculation of the eight-hour TWA of benzene exposure allegedly experienced by Plaintiff. Further, it should be noted that Plaintiffs fail to cite a <u>single</u> case or <u>any</u> scientific materials to support their argument that Spencer's calculation of the eight-hour TWA is incorrect.

---

[14] *See* Exhibit A, p. 12.

PD.8396256.1

Plaintiffs' counsel primarily takes issue with the fact that Mr. Spencer discounts the 23 ppm and 19 ppm benzene concentration measurements taken at Unit 1792 in January 1973.[15] Plaintiffs' counsel also claims that Mr. Spencer improperly includes the < 1 ppm benzene concentration measurements taken at Units 1792 and 292 in his calculation. Plaintiffs also question the data that Mr. Spencer used to calculate the 8-hour TWA, specifically claiming that Mr. Spencer "purposefully disregarded the available information" regarding the number of times that Plaintiff engaged in certain tasks during each of his shifts (which would have allegedly increased the amount of Plaintiff's benzene exposure).

However, these statements by Plaintiffs' counsel clearly show that they do not understand the proper methodology that should be employed in calculating TWA. TWA, time weighted average, is exactly that – it is a calculation of the exposure for the <u>entire</u> work shift or work period, not one or two "grab samples" in time.  Here, Mr. Spencer did not ignore or discount the 23 ppm and 19 ppm samples; he used them in his calculation. However, there is clearly no information about the task being done with those samples, and more importantly, they are for very brief periods in time (90 minutes and 120 minutes respectively). How does Plaintiffs' expert know that these samples were valid? Without more information, it would be entirely inappropriate and improper to conclude that Boutian was exposed to 23 and 19 ppm numerous times a day unless there is direct evidence to support this, yet this is exactly what Plaintiffs' expert does. As a result, Plaintiffs' expert calculates TWA on the basis of the <u>two</u> short term

---

[15] Significantly, Plaintiffs' own industrial hygienist Mr. Nicas relies exclusively on these two data points to estimate Plaintiff's benzene exposure in 1972, a year for which no testing data was available.  *See* Expert Report of Mark Nicas attached hereto as Exhibit C, p. 6.

samples, with no description of the work tasks performed during collection of these samples or any verification that the Plaintiff, himself, conducted such activity under the same condition.

Spencer, on the other hand, uses all of the available data, not just the 23 and 19 ppm data samples.  While such methodology may dilute two data points, it provides a  more representative picture of <u>overall</u> exposure, which is the goal.  In this regard, use of the < 1 ppm sample by Spencer is not only appropriate, but is consistent with the methodology of including all samples and  much  more  representative  of  the  exposure.    Plaintiffs'  expert,  however,  completely <u>disregards</u> the < 1 ppm sample, choosing to completely ignore it rather than utilize it at all, because this sample would have brought his overall TWA exposure results <u>substantially</u> lower.  Rather than lower his exposure results, Nicas chose instead to disregard a very pertinent sample, and chose instead to rely only on two short term samples of 23 and 19 ppm.  Defendants submit that it is Plaintiffs' expert's methodology that is flawed, NOT Mr. Spencer's.

Additionally, Plaintiffs are completely incorrect in their statement that Mr. Spencer converts measurements into an 8-hour TWA and assumes zero (0) exposure to benzene for the remainder of the day.  He does nothing of the sort.  Again,  the only example cited by Plaintiffs includes the 23 ppm sample.  This sample is a grab sample of short term duration, without any information as to the activity conducted or tasks involved.  It would be improper to simply assume that Plaintiff would be equally exposed over a longer period of time, when there is no evidence  to  support  such  an  assumption.    There  is  absolutely  no  evidence  that  Plaintiff performed the tasks or activities involved in this sample – in fact, the tasks involved with this sample are completely unknown.

PD.8396256.1

Plaintiffs also argue in this section of their memorandum that Mr. Spencer discounts testimony and evidence of "repeated" work place procedures.  Again, discounting certain evidence is certainly within the proper methodology of an expert and goes to the weight of the evidence, if there is reliable information to support such methodology. Moreover, here again Plaintiffs are incorrect about what Mr. Spencer did.[16]  The example given by Plaintiffs involves a 14 minute sample of 5 ppm while analyzing a benzene sample and washing glassware, which they contend was wrongly time weighted to a TWA value of .15.   However, there are other data samples (purposely ignored by Plaintiffs' expert) which shows these lab activities being performed in a long term sample which shows ppm of < 1 (very similar to .15 calculation by Mr. Spencer).   For example, there is a long term sample of 364 minutes (representing for more than 70% of the work shift), including laboratory analysis and benzene sampling.[17] This sample is "task specific" work in Unit 1792 (the benzene unit) and sampling. This long term sample in fact corroborates Spencer's methodology and of utilizing long term samples as representative of the work activities involved. Plaintiffs are simply erroneous that Spencer's method of calculation assumes that Mr. Boutain only performed one activity with potential exposure to benzene when he performed numerous tasks in a single work day.  By utilizing long term exposure data, rather than only relying on "grab samples" of just a  few minutes in time, a true representative picture of benzene exposure can be obtained, which is the proper methodology to employ and this is what Mr. Spencer did.

What Plaintiffs are doing in their motion is essentially challenging the factual basis of Spencer's opinion, rather than true methodology.  They use the term "methodology," but they

---

[16] *See* CHEVRON-BOUTIAN 000041attached hereto as Exhibit D.
[17] *Id.*

really are challenging his use and analysis of facts and the reliability of the facts.  However, a challenge to the factual basis of an expert's opinion is not a valid reason for the exclusion of expert testimony.  In *Utsey v. Olshan Foundation Repair Section Co. of New Orleans, LLP*, the Eastern District of Louisiana addressed the admissibility of expert testimony when opposing counsel filed a *Daubert* motion that challenged the factual basis of the proffered expert's testimony.[18] In ruling on the motion to exclude expert testimony, this Court stated that "[a]s a general rule, questions relating to the bases and sources of an expert's opinions rather than its admissibility should left for the jury's consideration."[19]  Quoting from the Advisory Committee Note to Federal Rule of Evidence 702, the Court noted that the "emphasis [in Rule 702] on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."[20] In fact, the Court stated that the "'factual basis of an expert opinion goes to the credibility of the testimony not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'"[21]  The Court held that opposing counsel's concern about the plaintiff's proffered economic expert would be "best resolved by vigorous cross-examination and the presentation of contrary evidence."[22]

Plaintiffs criticize Spencer for "discounting" certain facts or data.  However, Plaintiffs' expert virtually <u>ignores</u> data, such as the 1 ppm sample noted in the previous discussion above. In any case, the concept that the factual bases, including what facts the expert chooses to rely on and discount in forming his opinions, is a proper subject for cross-examination of the expert –

---

[18] 05-2593, 2007 WL 4162664 (E.D. La. Nov. 19, 2007).
[19] *Id.* at *3.
[20] *Id.*
[21] *Id.* (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)).
[22] *Id.* at *4.

PD.8396256.1

rather than the admissibility of his testimony – and has been established in both the Fifth Circuit and the Eastern District of Louisiana.[23] Consequently, any questions that Plaintiffs have with regard to the factual bases of Mr. Spencer's calculations, especially the calculation of the 8-hour TWA, are best resolved through cross-examination rather than the exclusion of Mr. Spencer's testimony.

Finally, Plaintiffs concluded this section of their brief claiming that Mr. Spencer's testimony in *Lane v. Gasket Holdings, Inc.*[24] was excluded for similar problems with his methodology. However, again, Plaintiffs are in error.  Mr. Spencer was not excluded as a witness in that case.  In fact, he testified in trial court, but a portion of his testimony was excluded. This however had nothing to do with his methodology.   The partial exclusion of testimony was because Mr. Spencer did not have specific knowledge regarding the source of asbestos exposure at issue.   In that case, there were two different classes of navy vessels involved, and in the court's opinion, Mr. Spencer's knowledge of asbestos in one class of vessels did not reasonably translate to knowledge about asbestos in the class of vessels used by plaintiff.  This is completely distinguishable from the reason Plaintiffs seek to exclude Dr. Spencer in this matter.  In fact, unlike  Plaintiffs' expert who has never been in a refinery, Mr. Spencer has been in a refinery numerous times and is knowledgeable about refinery operations. Moreover, unlike *Lane*, the sources of benzene exposure are not at issue here.  Both parties virtually agree on the sources of exposure; the dispute involves the calculation of cumulative benzene exposure between 1972– 1976 and this original methodology used by Mr. Spencer was both proper and reliable. The

---

[23] *See, e.g., U.S. v. 14.38 Acres of Land, More or Less Situated in Leeflore County, State of Mississippi*, 80 F.3d 1074 (5th Cir. 1996); *Johnson v. Samsung Electronics America, Inc.*, 10-1549, 2011 WL 4704203 (E.D. La. Oct. 4, 2011); *In re Cudd Pressure Control, Inc.*, No. 98-585, 1999 WL 756439 (E.D. La. Sept. 24, 1999).
[24] No. B153966, 2003 WL 21666623 (Cal. Ct. App. July 17, 2003).

partial exclusion of Mr. Spencer's testimony in *Lane* does not assist Plaintiff in the motion in *limine*. In contrast, Plaintiff's expert has been excluded for flaws in his methodology.[25]

### D. Mr. Spencer Correctly Interpreted the Data and Correctly Concluded that Plaintiff's Exposure Was Below the Applicable OSHA Permissible Exposure Limits

Fourth, Plaintiffs' claim that Mr. Spencer's opinion that Plaintiff's exposure was below the OSHA permissible exposure limits at the time of Plaintiffs' alleged exposure is incorrect. As a preliminary matter, Plaintiffs have mischaracterized Mr. Spencer's opinion on this particular point. In the summary of his opinions provided at the conclusion of his reports, Mr. Spencer states as follows: "Based on the historical air sampling data and the description of Mr. Boutian's responsibility and tasks, it is my opinion that his overall exposure to benzene at the time and, in many cases was below the current benzene occupational health standard."[26] Mr. Spencer states *in many cases* that Plaintiff's overall benzene exposure would fall below the current benzene occupation health standard – not that every single sample taken would be within the permissible levels of benzene under the current standard. Regardless, the issue in this case is limited to whether Plaintiff was exposed to benzene in excess of the industrial hygiene standards in place from 1972–1976. Additionally, there is nothing in the record to indicate that the two samples taken in January 1973 measuring benzene concentrations of 23 ppm and 19 ppm upon which Plaintiffs' counsel relies to dispute Mr. Spencer's opinion were even applicable to Plaintiff.

---

[25] *See* Defendants' Motion to Exclude the Expert Testimony of Dr. Mark Nicas (Rec. Doc. 119). In *Andrews v. U.S. Steel, Corp.*, 149 N.M. 461 (N.M. Ct. App. 2011), the Court excluded Dr. Nicas' opinion regarding dermal exposure of benzene because his methodology was considered "not scientifically valid or reliable." *Id.* at 466. Specifically, the district court found numerous errors with Nicas' calculation, including among others, the fact that flux rates for benzene did have any known reproducibility or reliability, that dermal absorption could not be combined with inhalation exposure for a total benzene exposure estimate, and that his dermal flux model was unreliable because it had not been validated or reproduced. *Id.*

[26] *See* Exhibit A, p. 13.

In support of their argument in this section of their memorandum, Plaintiffs first state that Gulf staff "indicated" that in their view, the two samples of 23 and 19 ppm meant that the 10 ppm 8-hour TWA in effect at the time was exceeded.   This is not accurate.  Of course, Gulf managers were concerned about these two (2) samples and what they did was completely appropriate – they believed those samples merited re-surveying the benzene unit, which they did. Plaintiffs' expert, Mr. Nicas, however, ignores this re-survey data, which shows the samples to be in compliance.  Also, Gulf used the air sampling data to make some changes in operating practices and personal protection, which would have lowered benzene exposure and further reduced employee exposure, which Plaintiffs' expert also ignored.   Once again, Plaintiffs exclusively focus on two short term samples in 1973 of 19 and 23 ppm.

Contrary to Plaintiffs' statement that Gulf concluded that the 10 ppm standard was exceeded, the conclusion of Gulf managers was that "it is <u>conceivable</u> that a unit operator's (responsible for collecting benzene) exposure <u>could</u> exceed the applicable OSHA limits" as is evidenced by the memorandum dated July 18, 1973.[27]  This memorandum goes on to recommend changes in operating procedures, which the evidence and testimony at trial will show were implemented. Moreover, the memorandum recommends the use of respirators, which would have eliminated any exposure at that time. Mr. Spencer considers all of the information in his exposure assessment. Plaintiffs' expert does not, and falsely claims that their two short term samples exclusively should be used to calculated TWA. Such is not correct methodology.

In their additional argument in this section, Plaintiffs inappropriately rely on the <u>current</u> standard of permissible benzene exposure (of 1 ppm per 8-hour TWA)  rather than the standard

---

[27] *See* CHEVRON-BOUTIAN 000057–58 attached hereto as Exhibit E.

that was applicable at the time of Plaintiff's alleged benzene exposure (of 10 ppm per 8-hour TWA). Finally, Plaintiffs attempt to manipulate Mr. Spencer's calculation of the 8 hour TWA, which incorrectly assumes that Plaintiff's benzene exposure was the same for all five years involved in this case (several of which years testing data is not available).  To the contrary, there is direct evidence that maintenance improvements were consistently made to operating practices, thus reducing benzene leaks and other exposure sources,  which is confirmed by the sampling and hygiene survey done in 1976.

> **E.    Mr. Spencer's Opinion Regarding Industrial Hygiene Practice at the Alliance Refinery is Sound**

In a similar manner to their argument regarding Mr. Spencer's calculation of the 8 hour TWA, Plaintiffs fault Mr. Spencer's opinion for his failure to account for six (6) different documents produced by Chevron during the discovery of this matter.

As discussed in the foregoing section, the factual basis of an expert's opinion is an appropriate subject for the cross-examination of an expert, but it should not be used to determine the admissibility of a proffered expert's opinion. Furthermore, Plaintiffs are misguided in relying upon *Inexco Oil Co. v. Crutcher-Tufts Corp.* for the proposition that if an expert uses facts that are unsupported by the record, the expert's methodology has not been properly applied.[28]  Under the facts of *Inexco*, the experts relied on records that contained factual inaccuracies and were known to the parties and discussed extensively in the pleadings.[29] As a result, the experts' opinions, which were premised on factually inaccurate reports, could not be considered reliable. *Inexco* is in marked contrast to the situation presented by the present case, in which Plaintiffs

---

[28] 389 F.Supp. 1032 (W.D. La. 1975).
[29] *Id.* at 1037.

disagree with Mr. Spencer's selection of available information to form his opinion. Plaintiffs have made no argument that the factual data used by Mr. Spencer in forming his opinion is inaccurate.

Plaintiffs' counsel also mischaracterizes the factual testimony of Plaintiff in order to discount Mr. Spencer's opinion about industrial practices at the Alliance Refinery.  Specifically, regarding rubber gloves, Plaintiffs state that the workers did not wear rubber gloves until 1977. However, there is both deposition testimony and documentary evidence to the contrary and Mr. Spencer's report correctly states that Plaintiff wore rubber gloves from 1972–1976.  As indicated by Mr. Spencer's citation to Plaintiffs' deposition,  in describing his routine on a typical day of work at the Alliance Refinery, Plaintiff specifically testified as follows:

> Q.    And I guess from the moment you leave your locker you're wearing your gloves?
>
> A.    For the most part, yeah, especially if I'm going to do any kind of valve operation; you know, opening or closing a valve, or whatever.   For the most part, the leather gloves, that's what they use for, just basically for working the valves.  I used rubber gloves, Rheem rubber gloves to get my samples and all.
>
> Q.    So at this point you were working on Unit 1792
>
> A.    Right.[30]

Mr. Edgerson also testifies that rubber gloves were available.[31] In addition, there are documents which indicate rubber gloves were used as early as 1972.[32]  Mr. Spencer correctly relied on this sworn deposition testimony in order to determine industrial hygiene practices at the Alliance Refinery at the time of Plaintiff's alleged benzene exposure. Plaintiff's expert, on the other hand,

---

[30] *See* July 16, 2012 deposition of Plaintiff, Hollis Boutian, p. 141 attached hereto as Exhibit F.
[31] *See* January 30, 2013 deposition of Ray Edgerson, pp. 76–77 attached hereto as Exhibit G.
[32] *See* CHEVRON-BOUTIAN 000118 attached hereto as Exhibit H.

PD.8396256.1

completely ignores the Gulf documents and instead exclusively relies on Plaintiff's biased testimony that he did not use gloves.

Similarly, Plaintiffs contend that respirators were not used until 1977, but there is deposition testimony and documents to the contrary.   For example, a memorandum in 1972 clearly states that respirators were available at that time.[33]   Therefore, Mr. Spencer is correct in these statements.

Plaintiffs are also incorrect in their assertion that Mr. Spencer ignored numerous Gulf internal documents.  None were ignored.  As evidenced by the many memoranda cited by Spencer,[34] at its start-up in 1972, the Gulf Alliance refinery employed safety and health personnel who were involved in assessing and correcting safety and health measures employed at the facility. In addition to the site-based safety and health personnel, Gulf corporate safety and health personnel, including Howard Runion, were involved in assuring the safety and health of the facility's personnel.[35]

Additionally, Gulf published a Safe Practice Pamphlet in 1959 on the Uniform Procedures for Safe Handling of Benzene and Toluene.[36]  This document notes exposures to benzene liquids and vapors could be harmful to a worker's health and any unusual exposure should be reported to the supervisor and the medical and health units. Gloves, goggles and cartridge respirators were required to be worn by workers when sampling benzene and when repairing pumps, lines, or other equipment in benzene service. Further, a file note dated October

---

[33] *Id.*
[34] *See* various Chevron memorandum attached in *globo*  as Exhibit I, CHEVRON-BOUTIAN 000038–000040, 000075, 000173, 000174, 000181, and 000201.
[35] *See* Exhibit I, CHEVRON-BOUTIAN 000174.
[36] *See id.* at CHEVRON-BOUTIAN 000083–000085.

20, 1972[37] indicated that the Alliance Refinery supervisor insisted that workers in contact with benzene wear rubber gloves, respirators when needed, and wash their hands immediately following any exposure. As an additional precaution, thirty (30) employees who were exposed to benzene at some during this period had their blood checked regularly.

In addition, a memorandum dated November 23, 1972 describes an industrial hygiene visit to the Alliance Refinery in which the Aromatic Extraction Unit was toured to observe where employees were potentially exposed to benzene.[38] This memorandum concluded that: "We could find no leaks or spills with this unit as it appears to be very tight and well maintained. Even the sampling spouts are of special design to eliminate any spillage during the collection of product samples." Recommendations were also made that the Gulf staff evaluate the exposure of the benzene unit employees to airborne benzene vapors as an additional safety precaution for the future.

One year after the Alliance Refinery became operational, air sampling for benzene and other constituents at the Alliance refinery was conducted in January 1973 in several units including 291, 292, 1391, 1791, 1792, and the lab.[39] Several of the samples collected for benzene were above recommended occupational exposure values and further additional sampling was recommended in order to "define the time weighted average and identify where the peak concentrations occurred" and in an effort to prevent future exposure. Based on this recommendation, air sampling was again conducted in June 1973.[40] Despite the fact that sample locations could not be identified, specific recommendations for reducing exposures were

---

[37] *See id.* at CHEVRON-BOUTIAN 000118.
[38] *See id.* at CHEVRON-BOUTIAN 000174.
[39] *See id.* at CHEVRON-BOUTIAN 000032–000034, 000073.
[40] *See id.* at CHEVRON-BOUTIAN 000057–58, 000062–000072.

PD.8396256.1

provided including increased ventilation in the laboratory, the immediate stop of any benzene leaks and that personnel working in the area should be encouraged to wear appropriate cartridge-type respirators until benzene leaks had been repaired.[41]  Later that same year,  additional air sampling for benzene was conducted in various units in August 1973.[42] The sampling indicated that the benzene time-weighted average exposure exceeded 10 ppm on two occasions, both regarding laboratory technicians. The report identified three main sources of potential benzene exposure in unit 1792 including draining the reflux drum boot, benzene leaks on pumps draining to the sewer, and the laboratory, where benzene analysis was conducted, and provided recommendations for correcting those issues.

Finally,  another round of air sampling for benzene was conducted in August and September 1976.[43] The memorandum noted that "the conclusion is that on this second sampling current standards are not being exceeded as was also concluded on the first sampling. The potential of over exposure from sewers, blow downs and sampling is present, but I find no evidence of its occurrence."  Air sampling for benzene was also conducted in November 1976 to determine the extent and sources of benzene exposure in the work place and to make recommendations based on this determination.[44] The average exposures from each of the units sampled were all less than the 10 ppm standard and noted that the Alliance Refinery was nearly in compliance with a 1 ppm standard for benzene exposure.

Overall, based on available testimony and Gulf Alliance Refinery documents, specifically during Mr. Boutian's Alliance Refinery work history between 1971 and 1977, there is more than

---

[41] *See id.* at CHEVRON-BOUTIAN 000057–000058.
[42] *See id.* at CHEVRON-BOUTIAN 000038–000054.
[43] *See id.* at CHEVRON-BOUTIAN 000076–000078; 000225–000230.
[44] *See id.* at CHEVRON-BOUTIAN 000137–000145; 000251–000283.

sufficient evidence to support Spencer's conclusion that the facility used sound industrial hygiene practices and sampling techniques that corresponded with the knowledge and technology of the time in order to quantify occupational exposures. Importantly, the facility used the air sampling data to make operational and personal protection changes in order to further reduce employee exposures.[45]  As a result, Plaintiffs simply cannot state that Mr. Spencer used facts that are unsupported by the record in this case.

### F.     Admissibility of Mr. Spencer's Testimony in Other, Unrelated Cases Is Irrelevant

Finally, Plaintiffs claim that Mr. Spencer's opinion should be discounted because his prior testimony in a wholly unrelated matter is purportedly inconsistent with the opinion he has provided about Plaintiff's benzene exposure in this particular matter. However, this prior testimony of Mr. Spencer is completely unrelated to the facts of the matter before this Court. Plaintiffs have provided absolutely no context as to why this facts of the case that formed the basis of this prior testimony are relevant in the pending case. For example, the *Watts* plaintiff was working with pure benzene in open tanks and containers, which is a very different situation than Mr. Boutian, who was working in a "closed" process system (system of pipes and tanks all closed).  Benzene exposure to intermittent leaks and samples in a closed process system is very different than exposure to open tanks of benzene. Also, the *Watts* plaintiff was cleaning "parts" with benzene and using benzene in other ways, which is a very different factual scenario from Plaintiff's work at the Alliance Refinery where any contact with benzene was accidental and very limited, such as sampling tanks, lab activities, infrequent benzene leaks. Additionally, the Plaintiff had available personal protective equipment including rubber gloves and respirators.

---

[45] *See* Exhibit A, pp. 5–7.

PD.8396256.1

Because this trial testimony in *Watts* is provided without any context and is completely irrelevant to the facts of this case, it should be disregarded for purposes of determining the admissibility of Mr. Spencer's opinion, or if of any value, can be used in cross-examination of Mr. Spencer at trial.[46] It is not, however, a basis on which to exclude Mr. Spencer as a witness.

## CONCLUSION

In summary, Mr. Spencer's opinions are based upon reliable and acceptable scientific methodology using accurate and relevant facts of the case as required by Federal Rule of Evidence 702. Accordingly, Plaintiff's Motion to Exclude Testimony of Defendants' Industrial Hygienist, John Spencer, should be denied.

---

[46] *See St. Pierre v. Maingot*, 01-2281, 2003 WL 25689900 (E.D. La. Apr. 7, 2003) (ignoring defendants' arguments that plaintiff's proposed expert testimony should be excluded based on prior inconsistent testimony and basing admissibility of expert opinion based on *Daubert* standards).

Respectfully submitted,

**PHELPS DUNBAR LLP**


BY:   /s/ Patrick A. Talley, Jr.
           Patrick A. Talley, Jr., (Bar #1616)
           Barbara L. Arras, (Bar #17908)
           Curt L. Rome, (Bar #29406)
           Sarah Perkins Reid, (Bar #33311)
           Canal Place | 365 Canal Street, Suite 2000
           New Orleans, Louisiana 70130-6534
           Telephone: 504-566-1311
           Telecopier: 504-568-9130
           Email:  talleyp@phelps.com
                    arrasb@phelps.com
                    curt.rome@phelps.com
                    sarah.reid@phelps.com

**ATTORNEYS FOR DEFENDANTS
CHEVRON U.S.A., INC., OIL INSURANCE
LIMITED, AND INSCO, LTD.**


**<u>CERTIFICATE OF SERVICE</u>**

I do hereby certify that I have on this 5th day of March, 2013 filed a copy of the foregoing

pleading with the Clerk of Court using the CM-ECF system, which sent electronic notification of

such filing to all counsel of record.


           /s/ Patrick A. Talley, Jr.

22